**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

Plaintiff,

vs. No. CR 04-1337 MV

JUAN PACHECO-SOTO,

Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Juan Pacheco-Soto's *Sentencing Memorandum and Supplemental Sentencing Memorandum and Request for Downward Departure*, filed December 16, 2004 and February 14, 2005 respectively **[Doc. Nos. 20 and 24]**. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, ruled at the sentencing hearing that it would grant Defendant's request for a departure based on his status as a deportable alien and that it would impose the mandatory minimum sentence of sixty (60) months. The Court now sets forth the basis for its prior ruling in this Memorandum Opinion.

**BACKGROUND**

The following facts related to the instant offense are set forth in the Presentence Report ("PSR"): On June 16, 2004, Drug Enforcement Agency ("DEA") agents were conducting surveillance at the El Paso/Los Angeles Limousine Express Bus Station in Albuquerque. At around 2:20 p.m., a bus arrived from El Paso, Texas en route to Denver, Colorado. Agents observed Defendant leave the bus and walk into the bus terminal. Agents noted that Defendant was not carrying any luggage with him.

The DEA agents approached Defendant, identified themselves, and asked about his travel plans. After a brief exchange, the agents asked Defendant if they could conduct a pat-down search of him. Defendant consented and the search yielded negative results. The agents then received consent from Defendant to search his tennis shoes. The agents removed the inner sole of the shoes and observed a taped bundle of suspected heroin underneath.

The agents handcuffed Defendant and proceeded to interview him. Defendant told the agents that he was supposed to take the heroin to a specific individual later that evening. Defendant had contacted this individual because he needed money for himself and his children. The individual had arranged for Defendant to go to Juarez, Mexico to pick up the shoes and return them to him in Albuquerque. The individual was supposed to pay Defendant $1,000 for delivering the shoes to him.

On September 15, 2004, Defendant pleaded guilty to an indictment charging Possession with Intent to Distribute More than 100 Grams of Heroin in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). This offense carries a five-year mandatory minimum sentence. After the Supreme Court's decision in *United States v. Booker*, 543 U.S. ____, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), Defendant filed a Supplemental Sentencing Memorandum, arguing that he merited a downward departure because of his status as a deportable alien and a sentence outside of the advisory Guidelines range based on his personal history.

## DISCUSSION

### I. The *Booker* Decision

*Booker* produced two holdings, joined by different majorities of the Court. First, the Court, reaffirming its holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L.

Ed. 2d 435 (2000), concluded that imposition of a sentence under the Sentencing Guidelines based on facts not found by a jury or admitted by the defendant violates the Sixth Amendment. *See Booker*, 124 S. Ct. at 756. Writing for the same bloc of Justices that formed the majorities in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) and *Apprendi*, Justice Stevens discerned "no distinction of constitutional significance" between the federal guidelines and the Washington statute that the Court found unconstitutional in *Blakely*. *Booker*, 124 S. Ct. at 749. Moreover, he saw no principled way to differentiate between "elements" of a crime and "sentencing factors" and rejected the proposition that the Sixth Amendment requires only the former to be proved to a jury beyond a reasonable doubt. *Id*. at 754-55. Thus, it was the mandatory nature of the guidelines – the fact that they had the effect of laws – that resulted in the violation of the defendant's constitutional rights in *Booker*. Justice Stevens acknowledged, however, that a system of advisory guidelines did not raise a Sixth Amendment problem because the Supreme Court has "never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range." *Id*. at 750.

Second, the remedial majority of the Court held that § 3553(b)(1), the provision of the Sentencing Reform Act ("SRA") that makes the guidelines mandatory, must be severed and excised along with the appellate review provisions of 18 U.S.C. § 3742(e), as well as any cross-references to section § 3553(b)(1). *Id*. at 756-57. According to Justice Breyer, these modifications to the SRA render the Guidelines advisory and thus constitutional. Under an advisory scheme, then, courts are still required to "consider" the Guidelines, but are also permitted "to tailor the sentence in light of other statutory concerns as well," including the sentencing factors set forth in 18 U.S.C. § 3553(a). *Id*. at 757.

District courts across the country have interpreted *Booker* differently. The court in *United States v. Wilson ("Wilson I")*, 350 F. Supp. 2d 910 (D. Utah 2005) concluded that "considerable weight should be given to the Guidelines in determining what sentence to impose" and that "[i]n all but the most unusual cases, the appropriate sentence will be the Guidelines sentence." *Id.* at 912. In *United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005), the district court specifically took issue with the court's approach in *Wilson*: "The directives of Booker and § 3553(a) make clear that courts may no longer uncritically apply the guidelines and, as one court suggested, 'only depart ... in unusual cases for clearly identified and persuasive reasons.'" *Id.* at 985 (citing *Wilson*, 350 F. Supp. 2d at 912). The court provided the following example:

> [U]nder § 3553(a)(1), a sentencing court must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, U.S.S.G. § 5H1.1, his education and vocational skills, § 5H1.2, his mental and emotional condition, § 5H1.3, his physical condition including drug or alcohol dependence, § 5H1.4, his employment record, § 5H1.5, his family ties and responsibilities, § 5H1.6, his socio-economic status, § 5H1.10, his civic and military contributions, § 5H1.11, and his lack of guidance as a youth, § 5H1.12. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history. Thus, in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range.

*Id.* at 986. The court also stated that "in some cases the guidelines will clash with § 3553(a)'s primary directive to 'impose a sentence sufficient, but not greater than necessary to comply with the purposes' of sentencing." *Id.* The court concluded that while "courts must in all cases seriously consider the guidelines ... [d]istrict courts cannot just add up figures and pick a number

within a narrow range." *Id*. at 987. Rather, "they must consider all of the applicable factors, listen carefully to defense and government counsel, and sentence the person before them as an individual. Booker is not an invitation to do business as usual." *Id*.

Some courts have followed the district court's reasoning in *Wilson I*[1] and have concluded that the Guidelines should remain the dominant or even determinative factor in sentencing analysis. *See, e.g., United States v. Wanning*, 354 F. Supp. 2d 1056, 1058 (D. Neb. 2005) (agreeing with *Wilson* that the Guideline range provides the presumptively reasonable sentence); *United States v. Barkley*, 369 F. Supp. 2d 1309, 1317-18 (N.D. Okla. 2005) (stating that the Guidelines would be "faithfully follow[ed]" in all cases, "with only such modifications as the Court finds are necessary to satisfy the requirements of the Sixth Amendment articulated in *Blakely*"); *United States v. Peach*, 356 F. Supp. 2d 1018, 1022 (D.N.D. 2005) (concluding that it will give "substantial weight" to advisory Guidelines because the Guidelines, policy statements, and sentencing tables and ranges were created at the behest of Congress and the statutory purposes of sentencing, as directed by Congress, are best reflected in the Guidelines).

Others have followed *Ranum* and have concluded that the guidelines range is but one factor that a court should consider when making a sentencing decision. *See United States v. Myers*, 353 F. Supp. 2d 1026, 1028 (S.D. Iowa 2005) (finding *Ranum* persuasive because "[t]o

---

[1] After *Ranum*, Judge Paul Cassell, the author of *Wilson I*, issued *United States v. Wilson ("Wilson II")*, 355 F. Supp. 2d 1269 (D. Utah 2005). In *Wilson II*, Judge Cassell declined to reconsider the defendant's sentence in light of *Ranum* and explained why he believed the reasoning of *Ranum* was flawed. "*Ranum*'s more flexible approach ... significantly alters without clear justification the Guidelines approach of giving limited effect to offender characteristics." *Id*. at 1275. Next, *Ranum* gives "undue emphasis to the prospect that an offender might become rehabilitated while in prison." *Id*. Finally, *Ranum* "pays little attention to the requirement that courts avoid unwarranted sentencing disparity. Only close adherence to the Guidelines offers any prospect of treating similarly-situated offenders equally." *Id*.

treat the Guidelines as presumptive is to concede the converse, i.e., that any sentence imposed outside the Guideline range would be presumptively unreasonable in the absence of clearly identified factors...[and] making the Guidelines, in effect, still mandatory."); *United States v. West*, ___ F. Supp. 2d ___, 2005 WL 180930 (S.D.N.Y. Jan. 27, 2005) (in wire fraud case, where stipulated guideline range was 57-71 months, sentencing defendant to 60 months, the statutory maximum; following *Ranum* in that Guidelines are only one factor to consider); *United States v. Huerta-Rodriguez*, 355 F. Supp. 2d 1019, 1025 (D. Neb. 2005) ("The court cannot adopt the position advanced by the government that a criminal sentence should fall within the Guidelines range, absent highly unusual circumstances. Such wholesale application of the Guidelines as *per se* reasonable effectively converts the now-advisory guidelines to mandatory guidelines triggering unconstitutionality in the same way the Washington guidelines did in *Blakely*.").

Some courts have urged a more evolutionary approach to sentencing after *Booker*. In *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Second Circuit found that it is not useful to determine in advance the weight that sentencing judges should give to applicable Guidelines ranges. Rather, it is "more consonant with the day to day role of district judges in imposing sentences and the episodic role of appellate judges in reviewing sentences ... to permit the concept of 'consideration' in the context of the applicable Guideline range to evolve[.]" *Id.* at 113. *See also United States v. Jaber*, 362 F. Supp. 2d 365, 371 (D. Mass. 2005) (agreeing with the Second Circuit's approach in *Crosby* and exposing flaws in the reasoning of *Wilson I* and *Wilson II*).

The Court finds the reasoning of the district court in *Ranum* compelling, as it more

faithfully adheres to the spirit of the Supreme Court's decision in *Booker* than do the *Wilson* opinions. The *Ranum* approach appropriately encourages district courts to abandon a "fear of judging" outside the confines of the Guidelines. *See Crosby*, 397 F.3d at 114. At the same time, the Court agrees with the *Crosby* and *Jaber* that the concept of what it means to "consider" the Guidelines must be permitted to evolve with time.

After *Booker*, in an advisory scheme, courts have the opportunity to correct some of the unwarranted rigidity of the mandatory scheme[2] and consider defendants before them in a more individualized manner, while at the same time striving to achieve realistic uniformity. *See United States v. Trujillo-Terrazas*, 405 F.3d 814, 819 (10th Cir. 2005) ("[W]hile the Guidelines still exert gravitational pull on all sentencing decisions ... district courts now have more discretion to tailor

---

[2] Before *Booker*, judges and commentators decried the inflexibility of the Guidelines and lack of discretion they afforded federal judges. *See* Louis F. Oberdorfer, *Mandatory Sentencing: One Judge's Perspective--2002*, 40 AM. CRIM. L. REV. 11, 17-18 (2003) (arguing that the Guidelines are flawed and suggesting that a common law of sentencing would produce fairer penalties); John S. Martin, Jr., *Editorial: Let Judges Do Their Jobs*, N.Y. TIMES, June 24, 2003, at A31 (citing the Guidelines as a reason for his retirement from the federal judiciary, stating, "I no longer want to be part of our unjust criminal justice system"); Ronald F. Wright, *Book Review: Rules for Sentencing Revolutions*, 108 YALE L.J. 1355 (1999) (likening the Guidelines to a "Reign of Terror"); KATE STITH & JOSE A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS (1998) (criticizing the harsh nature of the Guidelines and the lack of discretion provided to federal judges); Richard S. Frase, *State Sentencing Guidelines: Still Going Strong*, 78 JUDICATURE 173, 174-77 (1995) (discussing judicial discretion of state guidelines and criticizing federal guidelines as "uniquely and unnecessarily rigid"); Michael Tonry, *The Success of Judge Frankel's Sentencing Commission*, 64 U. COLO. L. REV. 713, 716, n.12 (1993) (criticizing the lack of judicial discretion in federal guidelines); Jack B. Weinstein, *A Trial Judge's Second Impression of the Federal Sentencing Guidelines*, 66 S. CAL. L. REV. 357, 363 (1992) ("[T]here is considerable justification for believing that guideline sentencing will continue to undermine federal criminal adjudication in ... subtle and insidious ways."); Daniel J. Freed, *Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers*, 101 YALE L.J. 1681, 1684, 1701-2 (1992) (noting that because of the Guidelines, "discretionary actors," including judges, prosecutors, defense attorneys, and probation officers, "find themselves torn between allegiance to rigid rules and an urge to do justice in individual cases").

sentences to the individual circumstances of a defendant."); *Crosby*, 397 F.3d at 114 ("We have every confidence that the judges of this Circuit will [consider the Guidelines], and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice."). To this end, district courts must move beyond rote adherence to the Guidelines and towards a more substantive and holistic analysis of whether a Guidelines sentence truly will achieve the sentencing purposes set forth in § 3553(a) in each individual case. As such, "the existing set of rules--the Guidelines--are very important, but they cannot be outcome-determinative without running afoul of *Booker*." *Jaber*, 362 F. Supp. 2d at 371.

## II. Sentencing Methodology After *Booker*

Because *Booker* has changed the landscape of federal sentencing, the Court finds it necessary, as a preliminary matter, to outline its post-*Booker* sentencing methodology. Although the Guidelines are no longer mandatory, courts must continue to consult them when making sentencing decisions. Thus, the Court will, as it always has, determine a Guidelines range by ruling on objections to the PSR and resolving factual disputes to the extent they exist. After this, the Court will determine whether any departures are appropriate pursuant to pre-*Booker* caselaw and relevant Guidelines policy statements. This step is particularly important.

> In order for the Court to fully consider the Guidelines and policy statements in a given case, the advisory Guidelines range must necessarily include a determination with respect to any departures contemplated or provided for thereunder. Overlooking the departure aspects of the Guidelines or treating the Court's new *Booke*r discretion as a substitute for or overlay of existing departure practice would sever a critical component of the Guidelines scheme, thus rendering any resulting advisory Guidelines range incomplete.

*United States v. Phelps*, 366 F. Supp. 2d 580, 585 (E.D. Tenn. 2005).

The Court's final task is to determine an appropriate and reasonable sentence that is "sufficient, but not greater than necessary, to satisfy the purposes of punishment." *See* 18 U.S.C. § 3553(a)(1). To do so, the Court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a), including the nature and the circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the guidelines and policy statements issued by the Sentencing Commission, including the advisory guideline range; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution where applicable.

"The court may impose a sentence within the applicable guideline range (after any clearly applicable departures) if such is consistent with the court's consideration of the § 3553(a) factors, or impose a non-guideline sentence if such is justified by the § 3553(a) factors." *United States v. Smith*, 359 F. Supp. 2d 771, 773 (E.D. Wisc. 2005). Because the Guidelines are no longer mandatory, a non-Guideline sentence "need not be supported by factors that would have justified a departure under the old, mandatory regime," *id.* (citation omitted), and a traditional "departure" is no longer necessary in order for the sentencing court to impose a sentence below the Guidelines range. *See Crosby*, 397 F.3d at 112, 113-14.

## III. <u>Advisory Guidelines Range</u>

Moving to the instant case, the PSR assigned Defendant a base offense level of 28 because DEA agents found 467.8 net grams of a mixture of heroin in Defendant's possession. *See* U.S.S.G. § 2D1.1(c)(6) (setting 28 as a base offense level when a defendant possesses at least 400 grams, but less than 700 grams of heroin). The PSR credited Defendant a two-level role

adjustment pursuant to the plea agreement and a three-level reduction for acceptance of responsibility, thus setting his adjusted offense level at 23. With a criminal history category of IV, this yielded an advisory Guidelines range of 70 to 87 months. The Court now proceeds to address Defendant's downward departure arguments.

**A. Departure from Advisory Range for Deportable Alien Status**

Before *Booker*, the Court had the discretion to consider a defendant's status as a deportable alien as a basis for downward departure in an extraordinary case. *See, e.g.*, *United States v. Lopez-Salas*, 266 F.3d 842, 846-51 (8th Cir. 2001) (holding that "alien status and the collateral consequences flowing therefrom may be an appropriate basis for departure"); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997) (holding that the district court had discretion to consider whether a downward departure was warranted based on defendant's alien status); *United States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir. 1996) (same); *United States v. Smith*, 27 F.3d 649, 651-55 (D.C. Cir. 1994) (pre-*Koon v. United States* case finding that downward departure based on deportable alien's severity of confinement may be proper, but "difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence [and] that the greater severity is undeserved"). In *Charry Cubillos*, the Ninth Circuit explained the rationale behind such a departure, specifically, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," an important tenet of the Guidelines. 91 F.3d at 1343.

Such departures were not always permitted. Before the Supreme Court decided *Koon v. United States*, 518 U.S. 81 (1996), other circuits, including the Tenth Circuit, held that collateral

consequences of alien status, such as ineligibility for more lenient conditions of confinement, could not serve as a basis for a downward departure. As the court explained in *United States v. Restrepo*, 999 F.2d 640, 645 (2d Cir. 1993):

> Considering the discretion that Congress has confided to the Bureau [of Prisons] and the reasonableness of the Bureau's consideration of the fact that the prisoner will be deported following the completion of his term of imprisonment, we think the court's disapproval of the Bureau's exercise of its discretion to deny that prisoner reassignment to a minimum-security facility is likewise an inappropriate basis for departure.

*See also United States v. Mendoza-Lopez*, 7 F.3d 1483, 1487 (10th Cir. 1993) (agreeing with the Second Circuit's reasoning in *Restrepo*).

Post-*Koon*, however, courts challenged the wisdom of forbidding a departure for deportable alien status. *See Farouil*, 124 F.3d 838 (questioning *Restrepo* and *Mendoza-Lopez*'s viability because *Koon* "'generally informs us that the district courts enjoy broad discretion in deciding whether to depart when the particular facts of the case are outside the 'heartland' of Guidelines cases."). "After *Koon*, federal courts can no longer categorically proscribe a basis for departure--unless the Commission has proscribed, as a categorical matter, consideration of the factor." *Lopez-Salas*, 91 F.3d at 1344. Rather, "sentencing courts must now determine, under the facts and circumstances of each case, whether the factor takes the case outside of the 'heartland.'" *Id*.

Here, it is solely because of Defendant's status as a deportable alien that he faces a unwarranted increase in the severity of his sentence. He likely will not eligible for any early release, he will not be able to serve his sentence in a minimum security prison, and he may not qualify for reduced credits for participation in a residential drug or alcohol abuse program. These

consequences are severe and unfair. In considering this issue, the Court distinguishes Defendant's case from that of other defendants who are sentenced for an offense, such as illegal reentry, that by its nature is committed only by deportable aliens. *See United States v. Gonzalez-Portillo*, 121 F.3d 1122, 1124-25 (7th Cir. 1997) (finding downward departure based on deportable alien status inappropriate where defendant was convicted under 8 U.S.C. § 1326, because deportable alien status was an inherent element of the crime and thus was clearly taken into consideration by the Sentencing Commission in formulating the guideline); *United States v. Martinez-Ramos*, 184 F.3d 1055, 1056 (9th Cir. 1999) (finding that defendant's status as a deportable alien could not be a ground for downward departure because "deportable alien status is an element of the crime that was necessarily taken into account by the Sentencing Commission in crafting the offense level for a § 1326 violation.").

Here, Defendant pleaded guilty to a drug offense, thus his alien status is irrelevant to the crime. *See Farouil*, 124 F.3d at 847 (where defendant was charged with importing heroin into the United States, finding "we have no reason to believe that the Guidelines have accounted for a defendant's status as a deportable alien in setting the level for that offense."). The Court, then, will not assume that the Sentencing Commission already took into account his deportable alien status and its severe collateral consequences when formulating the Guideline relevant to his case. For all of these reasons, Defendant's case is outside the heartland and a small departure is warranted.

At the sentencing hearing, the Court determined that a two-level departure would appropriately mitigate against the collateral consequences of Defendant's deportable alien status, while at the same time maintaining the integrity of the basic purposes of criminal punishment.

With a two-level departure, Defendant's total offense level is 21 and the resulting advisory Guidelines range is 60 to 71 months.

## IV. Imposition of Sentence

After determining Defendant's advisory Guidelines range, the Court moves to its final step: imposition of sentence. When determining whether a non-Guidelines sentence is appropriate, the Court considers the sentencing factors set forth in 18 U.S.C. § 3553(a). For ease of explication, the Court will group these considerations into three categories: the nature of the offense, the history and character of the defendant, and the needs of the public and any victims of the case.

### A. The nature of the offense

Defendant pleaded guilty to a drug offense that carries a mandatory five-year minimum sentence. Defendant's base offense level was increased based on the amount of drugs in his possession. There is no evidence that the offense was violent in any way. Further, Defendant's role was minimal -- he was a mere courier.

### B. The history and character of the defendant

Under the Guidelines, courts traditionally were forbidden to consider the defendant's age, U.S.S.G. § 5H1.1, his education and vocational skills, § 5H1.2, his mental and emotional condition, § 5H1.3, his physical condition including drug or alcohol dependence, § 5H1.4, and his family ties and responsibilities, § 5H1.6. As the district court stated in *Ranum*, however, the Guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant in the wake of *Booker*. 353 F. Supp. 2d at 986.

Accordingly, these factors are important to consider in fashioning a just sentence. Defendant, 26 years old, was born in Durango, Mexico and is one of eight children. Defendant and his family moved to the United States when he was nine years old. He became a legal resident in 1996. Defendant quit school in the tenth grade because his father was seriously ill. As a result of his lack of education, Defendant has limited educational and vocational skills and has been unable to provide for his wife and children in the way that he would like to. Further, Defendant has battled a chronic addiction to drugs and alcohol since he was 18 years, which contributed to his commission of the charged offense and other offenses in his criminal history.

**C. The needs of the public and any victims of the crime**

I have also considered the needs of the public, including the need to promote respect for drug laws. Here, Defendant faces a harsh mandatory minimum sentence of sixty months. The Court has no discretion to sentence Defendant below this term.

**D. Sentence**

While Defendant's situation is unfortunate, it is similar to many other deportable aliens that this Court sentences regularly. Thus, considering the totality of the circumstances, the Court believes that a sentence within the advisory Guidelines range is reasonable and complies with the sentencing objectives set forth in § 3553(a).

## CONCLUSION

At the sentencing hearing on May 24, 2005, the Court sentenced Defendant to an advisory Guidelines sentence of sixty (60) months, followed by a term of unsupervised release, after granting Defendant a downward departure based on his status as a deportable alien. The Court has enunciated its findings and the basis for the departure in this Memorandum Opinion and

Order.

**IT IS THEREFORE ORDERED** that Defendant's *Sentencing Memorandum and Supplemental Sentencing Memorandum and Request for Downward Departure*, filed December 16, 2004 and February 14, 2005 respectively **[Doc. Nos. 20 and 24]** are **GRANTED**.

**DATED** this 9th day of September, 2005.

MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorneys for the United States:
Stan Whitaker
Elaine Ramirez

Attorney for Defendant:
Brian Pori